## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| R. DALE MITCHELL, | |
| *Plaintiff*, | |
| v. | Civ. Action No. 07-1651 (KSH) |
| UBS SERVICES USA LLC, | <u>OPINION</u> |
| *Defendant*. | |

**<u>Katharine S. Hayden, U.S.D.J.</u>**

In early 2001, defendant UBS Services USA LLC ("UBS") hired plaintiff R. Dale Mitchell, who was almost 54 years old at the time, to work in its Corporate Information Security ("CIS") Department. Four years later, in 2005, UBS fired Mitchell, citing his persistent failure to satisfy the company's employment expectations. In response, Mitchell filed a two-count complaint against UBS, alleging violations of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1, *et seq.* He claims in this diversity action that UBS discriminated against him because of his age and in retaliation for complaining about the discrimination. UBS has moved for summary judgment [D.E. # 22], which the Court now grants for the reasons that follow.

## I.     FACTS & PROCEDURAL HISTORY[1]

UBS provides information technology services to its affiliated companies.  Def. R. 56.1 Statement of Material Facts ("Def. Facts") ¶ 1.  Its CIS Department is responsible for ensuring the technological security and integrity of computer systems throughout the UBS family.  *Id.* ¶ 2. The company hired Mitchell on February 2, 2001 to work as a Lead Associate in the CIS Department; Mitchell was 53 years and 11 months old at the time.  *Id.* ¶¶ 3-4, 7.[2]  Peter Sacher, a Systems Administration manager and Mitchell's direct supervisor throughout his employment at UBS, interviewed and participated in the decision to hire Mitchell.  *Id.* ¶¶ 5-6; Certification of Peter Sacher ("Sacher Cert.") ¶ 5.  Mitchell asserts that Sacher did not play a primary role in the interview and that the responsibility for the hiring decision came from Technology Officer Regina Toney.  Pl. Resp. 56.1 Statement of Facts ("Pl. Resp. Facts") ¶ 5.  Mitchell admitted at his deposition, however, that he did not know who made the ultimate hiring decision.  Def. Rep. R. 56.1 Statement of Facts ("Def. Rep. Facts") ¶ 5.

As a Lead Associate, Mitchell's responsibilities included the following:

- Establishing computer access for authorized users;

- Creating user IDs to ensure that UBS employees had sufficient access to the UBS system, consistent with their security clearances;

- Resolving and closing "tickets"—troubleshooting requests for assistance by computer users experiencing technical difficulties;

- Issuing passwords to UBS computer users to permit them to access the mainframe;

---

[1] Facts have been drawn from the amended complaint [D.E. # 6], the parties' statements of material fact submitted pursuant to Local Civil Rule 56.1, and exhibits submitted in support thereof.  Material facts discussed herein are undisputed unless specifically stated otherwise.

[2] Mitchell was actually hired by PaineWebber, UBS Services's predecessor in interest.  *See* Plaintiff's Exhibit ("Pl. Ex.") 1, attached in opposition to defendant's motion for summary judgment.

- Creating reports for user access;

- Conducting forensic analysis of computer users' activity;

- Providing "on-call" support upon request;

- Registering the correct installation date for computer programs, which are necessary for programs to be put into production at the correct time.

Def. Facts ¶¶ 10-15[3]; Certification of David B. Beal ("Beal Cert.") Ex. 5 (hereinafter referenced as "Mitchell Dep.") at 26:8-14; 28:25-31:23; 34:17-35:25; 36:1-25.[4]   When asked at his deposition whether he considered CIS's role within UBS important, Mitchell responded, "Oh yes, critical," and elaborated that without CIS, "things could be mismanaged, things could be misappropriated, things could be -- information could be damaged.  In a financial institution, it is built on trust and integrity of the data.  We must keep that [data] *precisely accurate*."  Mitchell Dep. at 25:5-15 (emphasis added).

Mitchell's employment went without incident until August 2004, when his superiors began alerting him of a series of job-related errors.  On August 11, 2004, Toney advised Mitchell via e-mail that he had processed a ticket (a troubleshooting request) incorrectly by assigning the user the wrong access code.  Beal Cert. Ex. 6; Def. Facts ¶ 17.  On August 19, 2004, Toney again e-mailed Mitchell, stating that he had failed to close a number of tickets that were supposed to be closed on August 4, 2004 (Mitchell had instead placed the tickets in a hold status).  Beal Cert. Ex. 7.  She requested that Mitchell close 12 remaining tickets and advised him that she "need[ed

---

[3] In his responsive statement of facts, Mitchell partially "disputes" UBS's characterization of some of the listed employment responsibilities.  *See* Pl. Resp. Facts ¶¶ 13-15.  These minor quibbles, however, are not material—the parties are in essential agreement as to what duties Mitchell was required to perform.

[4] Mitchell also submits as Exhibit 17 portions of his deposition testimony in opposition to defendant's summary judgment motion.  Where citations to his deposition do not appear in the Beal Certification, they appear at Exhibit 17.

him] to start taking extra steps and double check the information that's given in the request forms and not just place the tickets in pending or on-hold status." *Id.*; Def. Facts ¶ 18.   The next day, Toney alerted Mitchell that he had granted certain access to users who had not been approved, and emphasized that "I must stress to you to be careful when you are defining new dataset profiles[,] if you need help please see me."  Beal Cert. Ex. 8; Def. Facts ¶ 19.

On August 23, 2004, Toney e-mailed Mitchell the following:

> We were told **two years ago** by auditing that we can **no longer** setup user ids and make their **non-expiring password the same as the id**.  We spoke about this issue back on 7/26/04 when you processed GTS ticket 250034 to create the two non-expiring user ids RESPRD1 and RESPRD2.   You forgot **again** to run the **encryption job** that you created for the group back in December of 2000 that answered our audit issue . . . .  If you need more training on these procedures please see me.  If one of these processes are [sic] not followed correctly we will never be able to pass the audit.

Beal Cert. Ex. 9 (bold in original); Def. Facts 20.  A week later, on August 31, 2004, Noel Murphy (another UBS employee) e-mailed Mitchell (and cc'd Toney and Sacher) the following in response to Mitchell's modification of a ticket request that he had submitted:

> Here we go again.  You cannot modify either a new job request or an update to [a] current job request.  Once we process a request from you that's it.  You then have to fill out another online request form. . . .  We will then receive this new request and act on it.  Once a request is marked complete or in rare cases rejected that's it.  You either verify your request was done or you resubmit the request again correctly.   In the latter case yes a new request number is generated.

Beal Cert. Exh 10; Def. Facts ¶ 21.  Toney replied to Murphy's e-mail by e-mailing Sacher, stating that "[w]e went over this issue last week.  Dale was told he needs to generate a new ticket for [h]is updates, but again he used an old ticket number . . . ." *Id.*

On September 7, 2004, Mitchell e-mailed Sacher, alerting Sacher to an error he had made regarding changing a portion of a computer program, and advised him that he had forgotten to

make the necessary change, but that the error was in the process of being corrected. Beal Cert. Ex. 11; Def. Facts ¶ 23.

On November 10, 2004, Sacher e-mailed Mitchell requesting an explanation as to why he had sent an e-mail to a certain group of employees (the "Technology Infrastructure" distribution list) that should not have received it. Beal Cert. Ex. 13; Def. Facts ¶ 25. Mitchell explained that he was trying to find the correct recipient of the e-mail because the normal contact was out of the office, and unfortunately the list "turned out bigger than [he] thought." Beal Cert. Ex. 13. Approximately two months later, on January 11, 2005, Mitchell was sent an e-mail by Ron Seggio, Director of Application Support and Communication Services, again admonishing him to stop using the Technology Infrastructure distribution list because the e-mail to that list was being "delivered to many many people that should not receive it." *Id.* Ex. 14 (repetition in original); Def. Facts ¶ 26. In response, Sacher (who had apparently been forwarded the e-mail) reminded Mitchell of the erroneous e-mail in November 2004 that he had sent to the Technology Infrastructure distribution list, which sends a message to the "entire division." Beal Cert. Ex. 14. Sacher then demanded to know why Mitchell had again used the Technology Distribution list after being warned not to only two months before. *Id.*

In mid-January, 2005, Mitchell rotated in as the on-call associate responsible for troubleshooting technical issues that arose during off-hours. Beal Cert. Ex. 16. At 5:00 a.m. on January 15, 2005, Toney e-mailed Mitchell (and cc'd Sacher) with a technical problem that had arisen during the night. Beal Cert. Ex. 15. She stated that she had tried calling him at two different phone numbers, explained the particular technical issue, and asked him to verify her understanding of the issue. *Id.* Later that morning, Sacher e-mailed Mitchell, asking him to confirm that the numbers at which Toney had called him were correct; Sacher explained that he

5

too had experienced problems reaching him at the numbers.  *Id.*  Mitchell responded to Sacher at 10:18 a.m., stating that "[the numbers] are correct.  I [mu]st have left my PC plugged in when I fell asleep – the cell phone was on the charger.  I was going to check the job the next morning rather than at 3AM, for there was no rush."  *Id.*  Four days later, on January 19, 2005, Sacher e-mailed Mitchell to confirm that Mitchell's new laptop was functional (unbeknownst to Sacher, Mitchell had spilled coffee on his old one).  Beal Cert. Ex. 16.  Sacher stated that "[i]t is critical that you are able to remotely assist with any issues that arise off hours since you are on-call this week."  *Id.*

Mitchell does not dispute that he committed the errors described above; rather, he disputes the gravity and exceptional nature of the mistakes.  For instance, Mitchell asserts that the incorrect ticket that he processed on August 11, 2004 was a type of error "not uncommon for his co-workers."  Pl. Resp. Facts ¶ 17; Mitchell Dep. at 168:14-23.  With respect to his repeated e-mails to the Technology Infrastructure distribution list, Mitchell minimizes the impact of the mistakes, asserting that "in most cases, the only problem with sending an e-mail to the wrong distribution list [i]s that it creates clutter."  Pl. Resp. Facts ¶ 26; Mitchell Dep. at 58:5-9.  Regarding the tickets which Toney specifically advised Mitchell that he had failed to process and which prompted her request for him to take extra steps to close them, he avers only that the "amount of time required to close a ticket varies depending upon the ticket."  Pl. Resp. Facts ¶ 18; Mitchell Dep. at 153:5-16.  With respect to Toney's inability to contact him during his January 15, 2005 on-call duty, Mitchell acknowledged that he should have been reachable at the time Toney was attempting to contact him.  Mitchell Dep. at 65:13-22.  He asserts, however, that it was not uncommon for people in his department to be unreachable while on call, and that that incident was the first time he had been unavailable to meet his duties as the on-call associate.  *Id.*

at 172:15-173:24; *see also* Pl. Resp. Facts ¶ 30.[5]  Mitchell emphasizes that the other errors were easy to make and caused insignificant harm to the company, or in some cases, none at all.  Pl. Resp. Facts ¶¶ 21, 23, 24, 26.

Meanwhile, Mitchell asserts that between October 2004—shortly after the time in which UBS now asserts that he began underperforming—and January 2005, he and Sacher had a series of one-on-one meetings.  Def. Facts ¶ 40; Mitchell Dep. at 101:8-9, 109:15-20, 156:4-10.  He states that during these meetings, Sacher would begin "ranting and raving and shouting," but he cannot recall precisely what Sacher said other than that he called Mitchell "absentminded," "forgetful," and "slow."  Def. Facts ¶¶ 41, 48; Pl. Resp. Facts ¶ 48; Mitchell Dep. at 101:19-103:23, 184:22-187:1.  At his deposition, Mitchell described Sacher's demeanor at the first meeting, and his own reaction thereto, as follows:

> I was called into his office.  The door was closed.  And he started one of his rants.  And he was complaining about, oh, mistakes, not crossing the Ts or dotting the Is or a typo or a date that was off or something like that.  And it was not constructive. . . .  To my opinion, it was irrational. . . . He was using a very loud voice. . . . I was appalled and bewildered.

Mitchell Dep. at 156:11-157:13; Def. Facts ¶ 42; Pl. Resp. Facts ¶ 42.  When pressed as to what Sacher actually said, this exchange followed:

> Q:   So he called you into his office.  And tell me what you can recall was said in the conversation as closely as you can recall it as if I was listening to it.
>
> A:   That's the problem.  A lot of what he said didn't make a lot of sense.
>
> Q:   Regardless of whether it made sense –

---

[5] Mitchell also asserts that one of the reasons he could not be reached at the time was because he was in the subway and his pager could not receive radio signals.  Mitchell Dep. 173:13-18; Pl. Resp. Facts ¶ 30.  It is unclear, however, how Mitchell could be asleep and in the subway simultaneously.

A:      No –

Q:      – can you tell me what he said?

A:      No.

Q:      You can't recall what he said?

A:      No.

Q:      Can you recall generally what he said?

A:      Basically ranting and raving and then shouting.

Q:      Ranting and raving and shouting?

A:      Yes.

Q:      But you cannot recall anything specific that he said?

A:      No.  It was so – it didn't make any sense.

Q:      I'm not following you.  What do you mean it didn't make any sense?

A:      It was irrational.

Q:      What about it was irrational that he said?

A:      The train of thought.

Q:      But you can't tell me what it was –

A:      Not specifically.

Q:      – that led you to believe it was irrational?

A:      No.

Q:      Can you tell me why you claim that it amounted to discrimination on the basis of your age?

A:      Again, going back to you forget things and you're absentminded, and basically going back to you forget things, you forget things, you forget things.

8

> Q:    Now, you're saying going all the way back to that.  I'm not following that.  Are you saying that that was something that was said in October 2004?
>
> A:    Yes. Yes.
>
> Q:    So you do recall something that was said in October of 2004?
>
> A:    Yes.
>
> Q:    Okay.
>
> A:    You forget things.
>
> Q:    Okay.  Other than you forget things, is there anything else that you can recall –
>
> A:    No.
>
> Q:    – that he said in this conversation?
>
> A:    No.

Mitchell Dep. at 102:10-104:14.

Mitchell also could not recall specifically anything Sacher said at the second meeting between the two—weeks later—in part because he asserts that he "was very upset."  Def. Facts ¶ 43; Pl. Resp. Facts ¶ 43; Mitchell Dep. at 107:5-16.  He described Sacher's demeanor at the second meeting much the same as he did the first:

> He was again, very, very angry about something and just redressing me [to] no end about petty mistakes. . . .  I sat back and tried to figure out what this was all about and tried to defend my work as more important than crossing Ts and dotting Is.

Mitchell Dep. at 165:23-166:8; Def. Facts ¶ 46; Pl. Resp. Facts ¶ 46.  With respect to the other meetings, Mitchell could not recall anything specific that Sacher said, but did describe them as "pretty much cookie-cutter repeats of ranting and raving."  Def. Facts ¶ 45; Mitchell Dep. at 156:3-10.

After his second meeting with Sacher, Mitchell spoke with Jennifer Ryan, a Human Resources Generalist, regarding Sacher's behavior during the two prior meetings.  Def. Facts ¶ 51; Pl. Resp. Facts ¶ 51.  Mitchell testified that he told Ryan "how the discussion with Peter . . . had progressed," that "she took notes," and that "she was conciliatory, she was comforting, and she was offering advice . . . ."  Mitchell Dep. at 113:15-16, 114:22-24.  He cannot remember, however, anything specific that either he or Ryan said at the meeting other than that he said "I don't understand why [Sacher] is behaving this way."  Mitchell Dep. at 113:22-115:9; Def. Facts ¶ 51; Pl. Resp. Facts ¶ 51.  When Ryan offered to speak to Sacher, Mitchell declined, telling her:

> Maybe he'll calm down and straighten out and this won't happen again.  Maybe there's something bothering him that we don't know, family matter, I don't know what it is, but maybe he just woke up on the wrong side of the bed. . . . .  [L]et's see if he calms down and everything goes back to peace in the valley.

Mitchell Dep. at 115:20-25, 116:24-25; Def. Facts ¶ 51; Pl. Resp. Facts ¶ 51.

Mitchell again advised Ryan of Sacher's alleged intemperate conduct in October or November 2004, but cannot remember what was said, other than a general "recounting of what had transpired" between him and Sacher on that particular day.  Def. Facts ¶ 52; Mitchell Dep. at 117:16-119:13.  Mitchell testified that he had three more meetings between November 2004 and January 2005—two with Ryan and one with another Human Resources person (whose name he could not remember).  Mitchell Dep. at 119:14-123:19.  He could not recall specifically what was said at those meetings, other than that at each meeting he recounted to Ryan (and on the one occasion, the other unidentified employee) his recollection of what Sacher had said to him.  Def. Facts ¶¶ 53-55; Pl Resp. Facts ¶ 53-55.  On January 17, 2004, Mitchell agreed to allow Ryan to intervene on his behalf by meeting with Sacher.  Def. Facts ¶ 57; Mitchell Dep. 230:3-7.  Mitchell cannot recall exactly what was said at the meeting among the three, but he asserts that

they resolved that Sacher and Mitchell would try to work together better.  Mitchell Dep. at 125:11-126:12.

Although Mitchell received satisfactory employment reviews in 2001, 2002, and 2003, in his 2004 performance review issued on January 24, 2005, Sacher rated Mitchell's overall contribution a "4" (Objectives Partially Met) and his overall competency a "D" (Below Profile/Partially Effective).[6]  Def. Facts ¶ 27; Pl. Exhs. 2, 3.  Under the heading "Development Areas," Sacher stated that "Dale needs to focus on the details of both his daily responsibilities as well as the special reports he generates.  He has repeatedly made errors that should have been recognized before he implemented his changes."  Sacher Cert. Ex. 1; Def. Facts ¶ 27.

Mitchell's mistakes continued.  On January 27, 2005, Sacher e-mailed him asking why he had entered an incorrect installation date on a particular project.  Beal Cert. Ex. 17.  Mitchell admitted in his deposition that the installation date that he had entered was October 10, 2005 when, as Sacher noted in the e-mail, it should have been January 28, 2005.  Mitchell Dep. at 67:1-24.  He stated that he made the mistake because "[s]ometimes we reuse [forms] that still ha[ve] old dates on them[, and that] [i]f you're not very careful, you can leave the old date there."  *Id.* at 67:17-19.  Mitchell further acknowledged that, had Sacher not caught the error, the package would not have been installed.  *Id.* at 67:15-17.  He asserts, however, that "it [wa]s not unusual for one or more of us to miss a typo," *id.* at 67:22-23, and that the "mistake was easily correctable and did not cause any losses to UBS."  Pl. Resp. Facts ¶ 31.  On February 28, 2005, Toney e-mailed Mitchell informing him that he had created two new user IDs, but had neglected

---

[6] UBS rates employees on a performance rating scale using contribution and competency criteria. Contribution is measured on the following 1-5 scale:  1–Objective(s) Significantly Exceeded; 2–Objective(s) Exceeded; 3–Objective(s) Met; 4–Objective(s) Partially Met; and 5–Objective(s) Not Met. Competency is measured on the following A-E scale:  A–Greatly Exceeds Profile: Extremely Effective; B–Exceeds Profile: Very Effective; C–Meets Profile: effective; D–Below Profile: Partially Effective; and E–Much Below Profile: Inconsistently Effective.  Def. Facts ¶ 28.

to remove two access groups from the IDs, as Toney had previously explained must be done. Beal Cert. Ex. 18. Mitchell does not dispute that he made this error. Pl. Resp. Facts ¶ 32.

On March 2, 2005, Sacher met with Mitchell in order to place him on a Performance Improvement Plan ("PIP"). Def. Facts ¶ 33; Sacher Cert. ¶ 12. At the meeting, Sacher presented Mitchell with a three-page PIP, entitled "2005 Expectation Setting," which was dated February 7, 2005. Sacher Cert. Ex. 2. The PIP stated the following relevant objectives and expectations for Mitchell's performance going forward:

**Competency Development/Developmental Needs**

Ownership and Accountability

You must take ownership and accountability in the job responsibilities that are part of your day to day duties. Specifically[,] you are responsible to support your share of the telephone calls that are made to the Data Security hotline. You are also responsible to be able to support and be responsive when you are contacted off hours to support security issues. As an example[,] on January 15, 2005 when Job TSSD80AP failed[,] Regina Toney[,] the Lead of our group repeatedly tried to contact you with no success.

Attention to Detail

You need to demonstrate a consistent[,] sustained focus on "attention to detail" in all aspects of your job and responsibilities. There is more work to be done here. . . . Going forward I fully expect you to dedicate yourself to focusing your efforts on incorporating an "attention to detail" mindset across all your areas of responsibility[.]

**Conclusion**

I will sit with you on a monthly basis to discuss your progress on the above stated objectives. It is my desire to see you succeed in your position as a Lead Associate. Expectations, objectives[,] and

> your ongoing progress will certainly be discussed
> during our regular monthly meetings also.

Sacher Cert. Ex. 2.  Mitchell, Sacher, and Toney signed the PIP, although it is unclear whether Toney attended the meeting.  *Id.*

On March 4, 2005, Mitchell wrote to Ryan to tell her about a tragic 1991 accident that had fractured his skull and inner ear bones, left him without an ear drum, severed his olfactory nerves, and had affected his memory.  Beal Cert. Ex. 19.  He closed the letter by stating that "[w]hen I am told that I am forgetful and absentminded, I am the first to agree that I have been all my life.  I am just now more so than before February of 1991."  *Id.*  Mitchell does not dispute making this statement or its truth, but characterized it at his deposition as "tongue in cheek." Mitchell Dep. at 136:16-137:10; Pl Resp. Facts ¶ 60.

On Tuesday, March 22, 2005, Sacher e-mailed Elaine Pellunat-Rodriguez, Director of Human Resources, confirming his discussion with her on March 8, 2005 regarding Mitchell's performance.  Sacher Cert. Ex. 3.  In the e-mail (on which Ryan and another individual, Kent Cinquegrana, were cc'd), Sacher indicated that at Pellunat-Rodriguez's suggestion, he had "compiled documentation of the incidents that [he] . . . needed to address with Dale as it relate[d] to his performance in the group."  *Id.*  The e-mail further discussed Mitchell's 2004 performance failures and the development of the PIP.  *Id.*  It then stated the following:

> To date for this year I have not seen any improvement in Dale[']s performance which I also have documented and spoke to Dale about.  The main reason why both Kent and myself met with you was to show our concern that Dale[']s performance has not improved and to also stress that as a Senior security administrator in my group[,] Dale has administrative privileges at the highest level to perform his job.  We are very concerned that we have been fortunate that these incidents with Dale have not resulted in a major impact to the firm.  However[,] we feel the risk does exist.  I would like to know how much documentation and discussions with

> Dale you will require from me before we explore more serious
> actions?

*Id.* UBS asserts that between the time the PIP was implemented on March 2, 2005 and Sacher's

March 22, 2005 e-mail, Mitchell's performance did not improve.  Sacher Cert. ¶ 4.  It has not

submitted, however, any documentation pointing to any specific deficient performance issues

after Mitchell, Sacher, and Toney signed the PIP.  *See* Pl. Resp. Facts ¶ 35.

At some point between Sacher's e-mail to Pellunat-Rodriguez and April 12, 2005, the

ultimate decision was made to terminate Mitchell's employment, a decision in which Sacher

participated.  Def. Facts ¶ 36; Pl. Resp. Facts ¶ 36.  At a termination meeting held on April 12,

2005 between Mitchell, Sacher, and Ryan, Sacher gave reasons for his termination:

> We have had some concerns/issues that we have discussed with
> you in detail with appropriate examples and development activities
> in order to help you improve in these areas.  You have expressed a
> difference of opinion regarding your performance level versus the
> level that I perceive you at which has created a strain in our overall
> working relationship and has resulted in negative affect [sic] on the
> department.  We feel that at this time it is in the best interest for
> you and the firm, if we end this relationship effective today.

Def. Facts ¶ 37; Sacher Cert. ¶ 16, Ex. 4.[7]  At the time he was terminated, Mitchell was 58 years

old, and Sacher was 43 years old.  Mitchell Dep. at 24:7-8; Def. Facts ¶ 38.

Mitchell filed a two-count complaint in this Court on April 9, 2007 [D.E. # 1], and

thereafter filed an amended complaint on May 17, 2007 [D.E. # 6].[8]  The amended complaint

---

[7] Sacher has appended to his certification a "Sample Script" memorializing his conversation with
Mitchell.  Sacher Cert. ¶ 16, Ex. 4.  This document is substantially similar—although not
identical—to what Sacher certifies he advised Mitchell orally at the termination meeting.
Mitchell does not dispute the language in which UBS asserts Sacher orally advised him of his
termination, Pl. Resp. Facts ¶ 37, and thus the Court will assume that the language appearing at
paragraph 37 of the defendant's statement of facts (and paragraph 16 of Sacher's certification) is
the language that Sacher actually used.

asserts that UBS violated the NJLAD by terminating his employment on account of his age and in retaliation for complaints he had made about earlier discriminatory acts taken against him. Am. Compl. ¶¶ 12-15.  UBS answered on June 11, 2007 [D.E. # 8], and filed this motion on November 24, 2008 [D.E. # 22].  The case was transferred to the undersigned on February 24, 2009 [D.E. # 33].  On March 30, 2009, Mitchell—who by then was without benefit of counsel[9]—filed a letter [D.E. # 35] requesting leave to further amend the complaint to add a count of discrimination on the basis of disability.  After holding a conference call on the issue, Magistrate Judge Patty Shwartz entered an order [D.E. # 37] denying the request to amend and deeming Mitchell *pro se* unless and until counsel enters an appearance on his behalf.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must view the facts in the light most favorable to Mitchell, and must accordingly draw all inferences in his favor.  *See Gray v. York Newspapers*, 957 F.2d 1070, 1078 (3d Cir. 1992).  In opposing the motion, Mitchell "may not rest upon mere allegations or denials of the . . . pleading"; instead, he must, "by affidavits or as otherwise provided in [Rule 56]," set forth "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986).  In other words, there must be sufficient evidence for a jury to return a verdict for him; merely colorable evidence or evidence not significantly probative will not suffice.  *Ambruster v. Unisys*

---

[8] Diversity jurisdiction is proper pursuant to 28 U.S.C. § 1332(a).  Mitchell has not pursued a federal cause of action under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623, *et seq* ("ADEA").

[9] It appears that Mitchell's attorney has resigned from the practice of law.  *See* D.E. # 29.

*Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  UBS's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## III.   DISCUSSION

### A.   *Legal Standards*

As is relevant here, the NJLAD proscribes the discharge of any employee based on his or her age, absent a lawful justification.  N.J.S.A. § 10:5-12(a).  The act further prohibits "reprisals against any person because that person has opposed any practices or acts forbidden" under the NJLAD (i.e., age discrimination).  *Id.* § 10:5-12(d).  The analysis governing Mitchell's NJLAD claims is informed by that under the federal ADEA.  *See Retter v. Georgia Gulf Corp.*, 755 F. Supp. 637, 638 (D. N.J. 1991), *aff'd*, 975 F.2d 1551 (3d Cir. 1992); *see also Waldron v. SL Industries, Inc.*, 56 F.3d 491, 503-04 (3d Cir. 1995); *Dixon v. Rutgers,* 110 N.J. 432, 442-43 (1988); *Young v. Hobart West Group*, 385 N.J. Super. 448, 458 (App. Div. 2005); *Giammario v. Trenton Bd. of Educ.*, 203 N.J. Super. 356, 361 (App. Div. 1985).  Thus, the Court applies the familiar evidentiary burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973).[10]  Under that framework, Mitchell has the initial and relatively

---

[10] The *McDonnell Douglas* framework applies to Mitchell's retaliation claims under the NJLAD as well. *See Moran v. Davita*, *Inc.*, No. 06-5620, 2009 U.S. Dist. LEXIS 22951, at *49-53 (D.N.J. Mar. 23, 2009) (Pisano, J.) (analyzing retaliation claim under NJLAD using *McDonnell Douglas* framework). The Supreme Court of the United States recently eradicated a burden-shifting approach (with respect to the burden of persuasion) in mixed-motives cases brought under the ADEA, holding that a plaintiff carries the burden of persuasion at all times of proving that the employer's illegitimate reason was the "but for" cause of the adverse employment action. *See Gross v. FBL Financial Servs., Inc.*, No. 08-441, slip op. at 1, 4-5, 12 (June 18, 2009), *available at* http://www.supremecourtus.gov/opinions/08pdf/08-441.pdf. Mitchell does not argue that this is a mixed-motives case, and in any event *Gross* did not rule out a *McDonnell Douglas* evidentiary analysis in non-mixed-motives cases brought under the ADEA. *See id.* at 6-7 n.2 (majority opinion) ("[T]he Court has not definitively decided whether the evidentiary

light burden of establishing a *prima facie* case of discrimination.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  If he does so, an inference of discrimination arises, and UBS must produce a legitimate non-discriminatory justification in response thereto.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  Upon producing such a justification, the initial discriminatory inference evaporates, and Mitchell must then produce evidence creating a genuine issue of material fact as to whether UBS's proffered justification is pretextual.  *Id.* at 765.

### B. Analysis

Mitchell's theory in this case is that his age was the reason behind Sacher's verbal abuse, beginning in October 2004 and continuing through April 2005, as well as his ultimate termination from UBS.  *See* Am. Compl. ¶¶ 1, 6(a).  Specifically, he alleges that Sacher's outbursts at the one-on-one meetings with Mitchell were inflicted only upon him, and not on younger employees similarly situated.  *Id.* ¶ 6(a).  He also complains of Sacher's micro-management of his—but not his younger colleagues'—work.  *Id.* ¶¶ 6(g), 6(l). As evidence of discriminatory conduct, Mitchell avers that "Sacher's criticisms of [his] being forgetful [and absentminded] were . . . based, in part, upon a stereotypical assumption that employees over a certain age are forgetful [and absentminded]."  *Id.* ¶ 6(e).  The amended complaint further asserts

---

framework of [*McDonnell Douglas*] utilized in Title VII cases is appropriate in the ADEA context."); *see also id.* at 5-6 (Stevens, J., dissenting opinion) (listing non-mixed-motives cases that have applied *McDonnell Douglas* evidentiary framework).  Additionally, the New Jersey Supreme Court has yet to overrule the application of *McDonnell Douglas* to age discrimination claims brought under NJLAD.  Thus, *Gross* does not affect this case, and the Court therefore applies *McDonnell Douglas*.  Likewise, the Court continues to assume that under New Jersey anti-discrimination laws, an illegitimate "motivating" or "determinative"—rather than a "but for"—cause for termination constitutes an unlawful employment practice, at least for purposes of summary judgment analysis.  *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *DeWees v. RCN Corp.*, 380 N.J. Super. 511, 527-28 (App. Div. 2005) (adopting *Fuentes* summary judgment framework).  To the extent the Court cites federal case law that no longer applies post-*Gross* in the ADEA non-mixed-motives context, it does so with the understanding that those cases accurately state the current legal standards under the anti-discrimination laws of New Jersey.

that UBS fired him in retaliation for his meetings with Ryan, during which he complained about Sacher's alleged age discrimination. *Id.* ¶ 15.

    1.  <u>Discrimination</u>

To establish a *prima facie* case of age discrimination under the NJLAD, Mitchell must prove by a preponderance of the evidence the following:  (1) that he is a member of a protected class; (2) that he performed his duties at a level that met UBS's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that he was replaced by a "candidate sufficiently younger to permit an inference of discrimination." *Young*, 385 N.J. Super. at 458 (citing *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 210-13 (1999)).  The first, third, and fourth elements of a *prima facie* case are not in dispute here.  UBS argues, however, that Mitchell has not established that he lived up to the legitimate expectations placed upon him by his employer.  Def. Br. in Support of Motion for Summ. Judg. ("Def. Br.") at 16.  UBS further argues that even if Mitchell has established a *prima facie* case, he has not adduced evidence sufficient to cast doubt on UBS's proffered reason for terminating him.

Whether Mitchell has established a *prima facie* case of discrimination is a close question. Mitchell does not have a heavy burden at this stage.  *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 455 (2005).  The Court must make an objective assessment of Mitchell's performance considering only the evidence he has adduced; because performance markers like poor evaluations and documented job errors are "more properly debated in the second and third stages of the [*McDonnell Douglas*] burden-shifting test, they do not come into play as part of the second prong of the *prima facie* case." *Id.*  Instead, Mitchell correctly argues that all he must show is that "[he] was actually performing the job prior to the termination." *Id.* at 454.  Given his satisfactory employment from 2001 through most of 2004 and the garden-variety nature of

his mistakes, the Court finds that Mitchell has met his relatively light burden of establishing a *prima facie* case of discrimination.  *See Moran*, 2009 U.S. Dist. LEXIS 22951, at *45 ("The Court will assume, but not decide, that [plaintiff] established a *prima facie* case of discrimination, and evaluate whether [defendant] has articulated a legitimate, non-discriminatory reason for terminating [plaintiff's] employment . . . .").

Mitchell does not dispute that UBS's asserted justification—poor performance—is legitimate and non-discriminatory.  Pl. Opp. Br. at 8.  The Court therefore proceeds to the third stage of the *McDonnell Douglas* inquiry, and asks whether Mitchell can undercut UBS's cited justification as pretextual.  To do so, he "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve [UBS's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [its] action."  *Fuentes*, 32 F.3d at 764.  In other words, Mitchell "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [UBS's] proffered legitimate reason[] for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"  *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992).

The Court begins by noting that Mitchell's job-related errors are well documented and undisputed.  Additionally, as described above, Mitchell has acknowledged the importance of precision and accuracy in his daily routine.  In response to a question as to whether the role of CIS within the UBS family is important, he responded, "Oh yes, critical."  Mitchell Dep. at 25:5-8.  He then described what could happen without CIS's protection:  "[T]hings could be mismanaged, things could be misappropriated, things could be – information could be damaged. In a financial institution, it is built on trust and integrity of the data.  We must keep that [data]

*precisely accurate*." *Id.* at 25:9-15 (emphasis added).  Despite this admission that meticulous accuracy is an objective of the highest order at CIS, Mitchell does not dispute that beginning in August 2004, he made no less than eleven errors (documented above) that were called to his attention.  *See* Def. Rep. Br. at 3-6.  In likening the errors to mere failures to cross T's and dot I's that resulted in no significant harm to the company, he seriously minimizes his supervisors' expectations and warnings.  Furthermore, many of the documented mistakes are repeated errors, qualitatively identical to those which Toney and Sacher had counseled Mitchell to avoid.  While Mitchell might consider the errors miniscule in quality and impact, Toney and Sacher obviously considered them important.

That Mitchell's errors did not cause any significant harm does not mean UBS was unjustified in terminating him for cause.  First, Sacher emphasized in his e-mail to Pellunat-Rodriguez that the company had "been fortunate that [Mitchell's errors had] not resulted in a major impact to the firm.  However[,] we feel the risk does exist."  Sacher Ex. 3.  Given Mitchell's admission that seemingly minor errors could have grievous results, Sacher's perception that Mitchell posed a serious risk was not inappropriate.  Second, in assessing pretext, it is not the purview of this Court to select which errors UBS may and may not consider termination events. *See Peper v. Princeton Univ. Bd. of Trs.*, 77 N.J. 55, 87 (1978) ("Anti-discrimination laws do not permit courts to make personnel decisions for employers"); *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ("Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions."); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (affirming summary judgment for defendant because plaintiff

did not raise a genuine issue of material fact that the employer's reason to discharge him was pretextual when he acknowledged that his supervisors were dissatisfied with his performance, but argued that the employer made "too big a deal" of his problems).

Despite the mistakes that temporally preceded his termination, Mitchell makes three principal arguments to show that UBS's assertion of poor performance is nonetheless pretextual. First, he argues that Sacher berated and criticized him alone for his errors and did not admonish his younger colleagues for similar missteps.  Pl. Opp. Br. at 9.   Second, he argues that Sacher's use of the words "absentminded," "forgetful," and "slow," when referring to Mitchell, are euphemisms for older workers, and are thus evidence of Sacher's discriminatory animus.  *Id.* at 10-12.  Finally, he argues that his satisfactory performance reviews in 2001, 2002, and 2003 permit the inference that his 2004 performance review was based on his age.  *Id.* at 9-10.  These arguments are not persuasive.

First, Mitchell has adduced no evidence—save for his conclusory assertions—that Sacher treated him any differently than his younger compatriots.  While he refers to a "mountain of evidence which refutes the claim that [he] was terminated for poor performance," Pl. Opp. Br. at 10, Mitchell has not identified any co-worker who committed the same or a similar amount of mistakes, nor has he provided Sacher's alleged reactions thereto.  Furthermore, he admitted at his deposition that he knew nothing about Sacher's method of counseling his colleagues about their performance.  Mitchell Dep. at 253:6-13.  Sacher has submitted a reply certification in which he avers that "[w]hile Mitchell reported to me, he made significantly more job-related errors than his co-workers."  According to Sacher, when Mitchell's "co-workers would make a job-related error, [Toney or he] would counsel the employee about the error, just as [they] would counsel Mr. Mitchell."  Sacher Rep. Cert. ¶¶ 3-4.  Mitchell has not submitted any evidence (other than

his conclusory assumptions) that would permit a factfinder to discredit Sacher's assertion that he and Toney treated all CIS analysts—old and young—the same.

In *Greenberg v. Camden County Vocational and Technical Schools*, 310 N.J. Super. 189 (App. Div. 1998), the plaintiff withstood summary judgment as to pretext in her age discrimination claim by proffering evidence that younger teachers had similar deficiencies and received as many "memos of concern" as she did, yet were retained by the school district. *Greenberg*, 310 N.J. Super at 205-07. The plaintiff also submitted a statistical chart illustrating that of all the teachers up for tenure over the previous five years, all female teachers over the age of forty-five were terminated, while all the younger teachers were retained. *Id.* at 206-07; *see also Richards v. Johnson & Johnson, Inc.*, No. 05-3663, 2009 U.S. Dist. LEXIS 46117, at *23-27 (D.N.J. June 2, 2009) (denying summary judgment where plaintiff had proffered statistical data demonstrating potential age bias in hiring decisions). Here, in contrast, Mitchell makes bald assertions—without any corroborative evidence—that Sacher treated him differently from his colleagues. This is not sufficient to withstand summary judgment; Mitchell "may not rest upon mere allegations, general denials, or such vague statements" that Sacher subjected him (but not others) to ranting and raving. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); s*ee also Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981) ("[A] party resisting a [summary judgment] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."); *Warner v. Fed. Express Corp.*, 174 F. Supp. 2d 215, 223 (D.N.J. 2001) (conclusory assertions of discrimination and pretext without any such evidence to support those claims is insufficient to create genuine issue of material fact). Similarly, Mitchell cannot recall anything specific that Sacher said at any of the one-on-one meetings beginning in late 2004 (other than "forgetful," "absentminded," and "slow," *see infra*). Vague claims that Sacher

"ranted and raved" at meetings or that his conduct was otherwise "irrational," even if assumed as true, do not amount to evidence that UBS's assertion that it terminated Mitchell for poor performance—and not because of his age—is pretextual.

Second, Mitchell argues that as further evidence of Sacher's discriminatory purpose, his use of "the terms 'forgetful,' 'absentminded,' and 'slow' were veiled references to Mr. Mitchell's age, since it is a well-established stereotype that as people age, they become more forgetful, absentminded[,] and slow." Pl. Opp. Br. at 10-11. The Court rejects this argument. As Mitchell himself concedes, *see id.*, all three terms are age-neutral and do not by themselves suggest age bias. *See Perry v. Prudential-Bache Secur., Inc.*, 738 F. Supp. 843, 851 (D.N.J. 1989) (supervisor's comment that plaintiff was "burned out and forgetful" spoke not to his age but to his adequacy as an executive); *see also Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (manager's comment that employee "moved in slow motion" and was the same age as manager's father considered to be merely descriptive and not discriminatory); *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 610-611 (11th Cir. 1987) (assertion that old employee could not pass a physical exam not considered to be direct evidence of age discrimination).

In response to UBS's argument that the terms do not in and of themselves indicate Sacher's animus against older workers, Mitchell asserts only that "although that . . . may be true, it does not change the fact that as stereotypes, being forgetful, absentminded[,] and slow are characteristics of the elderly." Pl. Opp. Br. at 11. But again, the terms alone are not probative evidence that any discriminatory animus flowed from Sacher's statements; absentmindedness occurs in the young, middle-aged, and elderly alike. More important, Mitchell admitted to Ryan that he had been "forgetful and absentminded all [of his] life." Beal Cert. Ex. 19. Thus, not only

was Sacher's use of the allegedly stereotypical terms age-neutral generally, Mitchell specifically describes himself in those terms.

Finally, Mitchell argues that a rational factfinder could discern a discriminatory intent from Sacher's satisfactory performance reviews in 2001, 2002, and 2003.  Pl. Opp. Br. at 9-10.  But previously adequate reviews do not warrant stellar assessments in perpetuity.  *See Ezold*, 983 F.2d at 528 ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."); *Heck v. Am. Multi-Cinema, Inc.*, No. 07-4915, 2009 U.S. Dist. LEXIS 17441, at *28-35 (D.N.J. Mar. 4, 2009) (citing *Ezold*).  In any case, the e-mails documenting Mitchell's performance beginning in August 2004 fully support his lower 2004 review.  Furthermore, several of the e-mails advising Mitchell that he had committed a mistake originated from an employee *other than* Sacher.  *See* Beal Cert. Exhs. 6, 7, 8, 9, 10, 14, 15.  Not only does this fact corroborate the 2004 performance review, it undercuts Mitchell's general theory in the case—that Sacher was the source of the discrimination.[11]  Because Mitchell does not argue that Toney, Ryan, or anyone else at UBS discriminated against him, it is difficult to see why his 2004 performance review, although given by Sacher, is the result of age discrimination when documentary evidence generated by others not accused of unlawful discrimination substantively supports the review.  The Court agrees with UBS that Mitchell's emphasis on his earlier performance reviews is a non-sequitur:  it would defy logic to conclude that Sacher hired Mitchell when the latter was 54,

_____

[11] Mitchell's pretext argument is further weakened by the fact that Sacher was 43 years old at the time Mitchell was terminated, and was thus a member of Mitchell's protected class.  *See, e.g. Elwell v. Pa. Power & Light, Inc.*, 47 F. App'x 183, 189 (3d Cir. 2002); *Heck*, 2009 U.S. Dist. LEXIS 17441, at *33-34 n.7.  *Dungee v. Northeast Foods, Inc.*, 940 F. Supp. 682, 688 n.3 (D.N.J. 1996) (citing cases that hold that a plaintiff's ability to raise an inference of discrimination is hampered when the decision maker is a member of the plaintiff's protected class).

gave him adequate performance reviews for three consecutive years, and then "inexplicably and suddenly developed an aversion to 58-year olds . . . ."  Def. Rep. Br. at 8; *see also Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1267 n.24 (D.N.J. 1994), *aff'd*, 67 F.3d 291 (3d Cir. 1995) (granting summary judgment and stating that employers who hire an applicant knowing that he or she falls into a protected class will seldom be credible targets for pretextual termination).[12]

While Mitchell does not make the argument, the Court notes that the absence of any documented errors after Sacher placed Mitchell on the PIP is immaterial.  Mitchell's failure to meet UBS's subjective expectations before being placed on the PIP permitted the company to terminate Mitchell's employment at that time, and the Court knows of no requirement for placing an employee on an improvement program before termination becomes lawful.  *Cf. Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 21 (2002) ("[T]he employer's subjective decision-making may be sustained[,] even if unfair.").  Thus, even if the PIP was never intended actually to permit Mitchell to rehabilitate his position and reputation at CIS, the preexisting and non-discriminatory basis for his termination defeats any possible inference that his termination after the implementation of the PIP was on the basis of age.

In sum, Mitchell has presented no evidence that could permit a rational factfinder to conclude that UBS terminated him for any reasons other than his poor performance, which, again, is well documented.  While he argues that UBS "cannot cite any facts which would create an inference that Mr. Sacher's actions were not discriminatory," Pl. Opp. Br. at 12 (header), it is

---

[12] Mitchell also asserts that five other age discrimination lawsuits asserted against other UBS affiliates bolster his claim of pretext.  Pl. Opp. Br. at 11-12.  Given Mitchell's theory that the age discrimination came from Sacher alone, the Court agrees with UBS that the existence of other age discrimination suits within the UBS family is not probative of whether Sacher acted with discriminatory intent, and is thus not relevant to the matter before the Court.  *See* Fed. R. Evid. 401.

Mitchell's affirmative burden to establish facts indicating discrimination, not the other way around.  *See Zive*, 182 N.J. at 450 ("The burden of proof of discrimination does not shift; it remains with the employee at all times.").  Given the evidence of Mitchell's errors beginning in late 2004 and continuing into 2005, he has not met his burden.   The Court will therefore grant UBS's motion for summary judgment on Count One of Mitchell's amended complaint.

2.  Retaliation

To establish a *prima facie* case of retaliation, Mitchell must show that:  (1) he engaged in an activity protected by the NJLAD; (2) UBS took adverse action against him; and (3) there is a causal connection between the two events.  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001); *see also Moran*, 2009 U.S. Dist. LEXIS 22951, at *50.  With respect to the first prong, vague complaints or generalized grievances of unfair treatment without alleging the employer engaged in unlawful discriminatory conduct do not qualify as protected activity. *Moran*, 2009 U.S. Dist. LEXIS 22951, at *50-51; *see also Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (affirming district court's award of judgment as a matter of law to employer on employee's retaliation claim because plaintiff's letter complaining of generally unfair treatment did not specifically complain of prohibited discrimination).   "Although a plaintiff need not file a formal complaint of discrimination to meet the first prong of the *prima facie* case, to constitute protected activity, the opposition, complaint or protest, whether formal or informal, must clearly indicate a belief that an act forbidden by the NJLAD has occurred." *Hood v. Pfizer, Inc.*, No. 04-3836, 2007 U.S. Dist. LEXIS 72696, at *60 (D.N.J. Sept. 28, 2007) (citing *DeJoy v. Comcast Cable Commc'ns Inc.*, 968 F. Supp. 963 (D.N.J. 1997)).

Mitchell has failed to establish a *prima facie* case of retaliation.   He asserts that he engaged in activity protected by the NJLAD when he proceeded to Ryan's office to complain

after each incident of Sacher's verbal abuse.  But he cannot recall what he said to Ryan other than that Sacher's "ranting and raving and . . . shouting" was "irrational," was "not constructive," and that he was "appalled and bewildered" in response to such conduct.  Mitchell Dep. at 102:10-104:14, 156:11-157:13.  He also asserts that each time he went to Ryan, he recounted what had just transpired in Sacher's office, but he cannot recall what it is that Sacher said.  Despite this, he argues the cases cited above are distinguishable because he "complained on several occasions about ongoing abusive behavior, which could easily be identified as discriminatory."  Pl. Opp. Br. at 16.  Even if the Court could credit Mitchell's assertion that Sacher's conduct was discriminatory (it has found above that it cannot), noticeably absent from Mitchell's argument is any assertion that he actually complained about age discrimination.  Viewing the facts in the light most favorable to Mitchell, the most that can be said on the evidence adduced is that he complained to Ryan of Sacher's general demeanor towards him.  Again, generalized complaints of non-discriminatory mistreatment are not actionable under the NJLAD's retaliation provisions.

For the same reasons that apply to Mitchell's discrimination claim, the Court also finds that even if he had established a *prima facie* case of retaliation, he cannot rebut UBS's asserted justification—Mitchell's sub-par performance.  Summary judgment is appropriate on Count Two of the amended complaint on this basis as well.  *See Moran*, 2009 U.S. Dist. LEXIS 22951, at *53 (after finding *prima facie* case of retaliation lacking for plaintiff's failure to establish that she had engaged in protected activity, incorporating by reference pretext analysis for discrimination claim into pretext analysis for retaliation claim and concluding that plaintiff had not undermined defendant's proffered justification in any event).

**IV.     CONCLUSION**

For the reasons stated above, defendant's motion for summary judgment is granted.  An appropriate order accompanies this opinion.


/s/  Katharine S. Hayden

Hon. Katharine S. Hayden
United States District Judge